## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**JOHN J. IDEN,**

        **Petitioner,**        :

    **v.**

**WARDEN, SOUTHEASTERN**
**CORRECTIONAL INSTITUTION,**    :

       **Respondent.**

**Case No. 2:23-cv-2525**
**Chief Judge Sarah D. Morrison**
**Magistrate Judge Chelsey M. Vascura**

### <u>ORDER</u>

John J. Iden, a state prisoner who is proceeding without the assistance of counsel, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (Petition, ECF No. 1.) This matter is currently before the Court on Respondent's Motion to Dismiss the Petition as time-barred. (Mot., ECF No. 8.) Petitioner responded (Resp., ECF No. 10), Respondent filed a Reply (Reply, ECF No. 11), and Petitioner filed a sur-reply (ECF No. 12). Petitioner also requested that the Court disregard an anticipated filing by a non-party who was hired to provide legal services on Petitioner's behalf. (ECF No. 13.) The anticipated non-party submission was filed shortly thereafter. (Clark's Memo, ECF No. 14.) Finally, Petitioner filed "Supplemental Evidence" in support of his arguments on equitable tolling. (ECF No. 15.) Respondent has not addressed the four latest filings (ECF Nos. 12–15).

For the reasons set forth below, the Court **STRIKES** Petitioner's sur-reply and supplemental evidence (ECF Nos. 12, 15) and the non-party's submission (ECF

No. 14) because they were filed in violation of the Court's Rules. Petitioner's motion to disregard the non-party's submission (ECF No. 13) is **DENIED** as moot.

With respect to the Motion to Dismiss (ECF No. 8), the Court **CONCLUDES** that the Petition was not filed within the one-year statute of limitations for habeas corpus actions but **RESERVES** a conclusion on whether equitable tolling applies. Respondent is **ORDERED** to file an Answer and any necessary additional state-court record materials, and Petitioner may file a Reply, consistent with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules"). The parties may further address equitable tolling in their Answer and Reply but should not address the statute of limitations issue resolved herein. Respondent's Motion to Dismiss will be **HELD IN ABEYANCE** until these filings are made and considered.

## I.    BACKGROUND

Petitioner was indicted in 2017 for crimes committed in 1998. (Record, ECF No. 7, PAGEID # 54–57.) A jury empaneled in the Court of Common Pleas of Muskingum County, Ohio, convicted him of six counts: kidnapping, rape, attempted murder, felonious assault, kidnapping in order to terrorize or to inflict serious physical harm, and kidnapping with sexual motivation.[1] (*Id.*, PAGEID # 88–89.) The trial court also found him guilty under a sexually violent predator specification. (*Id.*) Thereafter, the trial court sentenced Petitioner to life in prison with eligibility

---

[1] The State later requested leave to nolle the felonious assault count, which the trial court granted. (*See* Record, PAGEID # 90.)

for parole after thirty years and classified him as a Tier III sex offender. (*Id.*,

PAGEID # 91–92.)

On direct appeal, the Fifth District Court of Appeals described the evidence

against Petitioner as follows:

> On the morning of September 26, 1998, Robert Kremer drove to the
> Dillon State Park hunting area in Nashport, Ohio to do some
> groundhog hunting. As he drove down a gravel access road into the
> park, he came upon a half-naked, blood-soaked woman standing in a
> field off the side of the road. Kremer stopped, grabbed a blanket he had
> in his truck and approached the woman.
>
> Kremer observed the woman was bleeding profusely from a horrible
> injury on the top of her head. She was shaking, appeared to be in
> shock, and could only say "help." Kremer wrapped the blanket around
> the woman and attempted to call 911, but had no cell phone reception.
> He put the woman into his truck, drove back to the main road and
> tried again. Unsuccessful, Kremer drove further up the road to a home
> and asked the occupants to phone for help.
>
> Muskingum County Sheriff's Office Lieutenant Franklin Pete Fisher
> arrived on the scene at approximately 9:30 a.m. to find the bloodied
> woman seated in Kremer's truck, wrapped in the blanket and
> otherwise wearing nothing but a t-shirt and one sock. He attempted to
> speak to the woman, but she was incoherent. Fisher could not even
> determine her name. Detective Steve Welker arrived second on the
> scene, and then Natural Resource Officer Mike Reed. Welker stayed
> with the woman to await an ambulance while Fisher and Reed
> followed Kremer back to where he found the woman.
>
> The men searched the area where the woman was found. Fisher
> eventually located a pile of clothing – jeans, tennis shoes and
> underwear. Leading up to the area where the clothing was found, he
> additionally found bloody drag marks on the ground and a pool of
> blood. Fischer called for an evidence technician to process the scene.
>
> Meanwhile, Detective Welker accompanied the woman to Good
> Samaritan Hospital. Once there he could see she had a serious head
> injury. Her skull was visible in several places. She also had other
> injuries over her entire body which Welker photographed. Although
> she was in and out of consciousness, Welker eventually got the

woman's name, J.M., a phone number for her aunt, and the fact that she had been physically and sexually assaulted by one person.

Nurse Vickie Bell completed a rape kit on J.M. that morning which was later transferred to the Bureau of Criminal Investigations (BCI) for testing. She completed the appropriate steps and collected the appropriate samples.

J.M.'s aunt, T.H., arrived at the emergency room and spoke with law enforcement. She advised that J.M. had been out with her friend Ricky Allen the evening before and that detectives should speak with him. J.M.'s mother wanted Allen arrested because before J.M. went into surgery, she told her mother Allen had done this. Later, however, J.M. told her aunt John Iden had done this to her. T.H. passed this information on to law enforcement.

J.M.'s injuries were extensive, and potentially fatal. She was seen in the emergency room by a neurosurgeon, Dr. Michael Bruce Shannon. J.M had linear lacerations to her face, neck and extremities. These were torn-tissue lacerations as opposed to cut lacerations, some of which required sutures. J.M. additionally had bruises and linear abrasions on her arms, legs and buttocks consistent with the drag marks observed by Fischer at the scene. She also suffered a posterior depressed skull fracture. Shannon opined these injuries were inflicted, and not caused by a fall or other accident. He further opined J.M. had been held down, partially strangled, and that she had attempted to fight off her attacker.

Dr. Shannon performed the surgery to repair J.M.'s skull. He removed debris and bone fragments and repaired a tear in the dura, the thick protective membrane encasing the brain, and from which J.M.'s spinal fluid was leaking. He then closed the scalp. J.M later required 2 additional surgeries. One when the bones in her skull became infected, and a second to repair the defect in her skull and add a skin graft to close the area. J.M. was left permanently scarred.

J.M.'s brain injury may have been more severe had she not been hypothermic upon arrival in the emergency room. Still, the portion of J.M.'s brain that was injured impacted speech, understanding, and both short and long-term memory. These deficits are permanent. J.M was unable to recall the event that left her with life-threatening injuries.

A few days after arriving at the hospital, J.M. was also seen by gynecologist Dr. John Lepi. Lepi's vaginal exam revealed a half-inch

4

tear at J.M.'s posterior fourchette, the area between her vagina and rectum. The tear had begun to heal on its own. Dr. Lepi further observed on the right side of J.M.'s vagina, and to the right of her cervix, an area of denuded epithelium. In other words, the inside surface layer of the vagina had been abraded. Lepi explained this was indicative of some type of forced entry which would not occur with normal intercourse.

The subsequent investigation in to this matter revealed that J.M. was at her neighbor's house around 12:30 a.m. where Ricky Allen was also visiting. When Allen said he was leaving to go to a bar, J.M. asked if she could ride along. The two went to a bar called the Lighthouse and split up. Later, while Allen was dancing, J.M. approached and introduced him to a man Allen believed she had picked up – Iden. She told Allen that they were leaving and Iden would give her a ride home.

Allen got home around 3:30 a.m. Later that day, he discovered Detective Stutes of the Muskingum County Sheriff's Department wanted to talk to him about J.M. Allen spoke with Stutes, and cooperated fully. He told Stutes what he knew and permitted Stutes to search his car and seize the clothing he had been wearing the evening before. Later testing of these items revealed nothing of evidentiary value. Presented with a photo array, Allen identified Iden as the man J.M. left the Lighthouse with.

Detective Stutes was able to speak with J.M on September 28, 1998, even though she was in critical condition. She identified her attacker as "Mark," said she worked with him at Union Tools, and that he had given her a ride to and from work a few times. She also recalled he drove a white Ford Tempo. She told Stutes they had been to the Lighthouse, City Limits, and Beach Ridge bars. She had no recollection, however, of events from the time she left the Beach Ridge until she woke up in the hospital.

Following up on this information, detectives retraced J.M.'s travels on the night in question. They spoke with Lighthouse bartender Darlena Compton, who stated J.M. is her cousin and that she saw J.M. at the Lighthouse in the early morning hours of September 26, 1998. Compton stated J.M. arrived with Ricky Allen, but left with John Iden. Compton had not met Iden before that evening, but J.M. told her his name, that they worked together, and he was giving her a ride home. Compton also stated J.M. was drinking that night.

Detectives next spoke with City Limits bartender Jennifer Harris-Winters. Harris-Winters recalled J.M. because she refused to serve her

as she had no identification. J.M. was not happy about this and "created a bit of a scene" before leaving. J.M. told Harris-Winters she and the male she was with were going to go to the Beach Ridge Lounge where she could get served. Harris-Winters was not familiar with J.M. or the man she was with.

Detectives then spoke with bartender Kim Erdy who worked at the Beach Ridge Lounge the morning in question. Erdy went to high school with J.M. and confirmed she was at the Beach Ridge after midnight with a younger looking, dark-haired male. Presented with a photo array, Erdy identified Iden as the man with J.M. Erdy recalled J.M. drinking shots of tequila, and Iden having a beer. Although Erdy knew the two stayed at the bar until closing, she did not see them leave.

Detectives then spoke with bartender Glenna Sanborn, who is Erdy's mother and also familiar with J.M. She too was working at the Beach Ridge the morning in question. She recalled J.M. arriving at the bar with a young-looking male. He appeared so young that Sanborn had the doormen double check his identification. Presented with a photo array, Sanborn identified Iden as the man J.M. was with. She told detectives J.M. was drinking shots of tequila. At closing, she saw J.M. and Iden leave together. Additionally, across the street from the Beach Ridge was a truck stop that many frequented for breakfast after the bars closed. Sanborn was there at 3:00 a.m. for breakfast that morning and saw J.M. and Iden walking around the truck stop.

Gregory Zigan, who knew J.M. from high school, and had previously met Iden through a friend, was also at the truck stop that morning visiting his mother-in-law who worked there. He too advised detectives that he saw J.M. and Iden walking around the truck stop and picked Iden out of a photo array. He further advised that Iden sometimes went by the name of Marcus, but his real name was John.

As evidence quickly turned the investigation from Allen to Iden, detectives set out to find Iden. They arrived at his home just as he was leaving in a white Ford Tempo. He was stopped, and the vehicle seized.

Detective Stutes spoke with Iden regarding his whereabouts on September 25-26, 1998. According to Iden he was at the Eagles with his mother and stepfather where he saw J.M. and another woman around 12:15 a.m. The three then went to the Beach Ridge where J.M. did shots and he had a beer. Iden stated he lost track of the other woman. He told Stutes J.M. was talking to one of the barmaids and another man who offered her a ride home. He intervened and said he was J.M.'s ride. Iden stated that shortly thereafter, he told J.M. they

6

were leaving. He recalled it was around 1:00 or 1:15 a.m. Iden described J.M. as "bomb-shelled" and "totally out of it." He told Stutes she passed out as soon as she got into his Ford Tempo, and that he took her straight home. Iden said he knew J.M. lived with her aunt on Church Street because they worked together and he gave her a ride to and from work from time to time. He claimed he dropped her off there, needing to first shake her awake and then practically carry her to the front porch where he left her because she did not want her aunt to know she had been out drinking. Iden claimed he was in bed by 2:30 a.m. He additionally claimed he was unfamiliar with the Dillon State Park area.

Muskingum County Sheriff's Department evidence technician Timothy Hartmeyer processed the scene at Dillon State Park as well as Iden's Ford Tempo. At the crime scene, Hartmeyer had recovered several items of clothing, shoes, underwear, and a pair of urine-soaked jeans.

While processing the Tempo, Hartmeyer noted that the inside of the right front door of the car looked as though it had very recently been wiped down as it was clean and the rest of the interior of the car was covered with a layer of dust. Hartmeyer took several samples from suspect stains on the passenger side of the car, inside and out. It also appeared to Hartmeyer that the passenger side front floor mat had recently been removed, as the carpet underneath where it had been was clearly indented in the shape of the missing mat. He further noted that there were balls of fiber at the crime scene which were consistent with the carpet in the Tempo's floorboards. On the passenger seat of the car was a tool box. Inside, there were tools with suspect stains, and in the bottom of the box, fresh soapy water. In the trunk of the Tempo, there was a spare tire and a jack, but no tire iron.

On October 22, 1998, Detective Stutes requested further samples from Iden's car because preliminary lab reports identified areas of blood. Ultimately, a blood stain from inside the rear passenger side door was below reporting standards, but consistent with J.M. Stains from the tools yielded no reportable results.

Sometime shortly after the events of September 25-26, 1998, detectives spoke with Iden's girlfriend at the time, Crystal Dunlap. Dunlap was also friends with J.M. The first time detectives spoke with her, she offered nothing as she feared Iden. The second time, however, Dunlap stated she had become suspicious of Iden's possible involvement in J.M.'s rape and assault and asked him about the matter while she was riding in his car. Iden responded by holding a crowbar across Dunlap's body and stating "I did it to her and I can do it to you."

7

In 1998, J.M.'s rape kit was processed at the BCI. The vaginal swabs and smears tested and were negative for semen. As per policy at that time, therefore, no further testing was done. In 2016, however, as part of a statewide initiative to re-test rape kits using today's advanced technology, J.M.'s rape kit was resubmitted for testing. Upon retesting, the perianal swab (the skin around the outside of the rectum) from the kit identified a mixture of DNA, J.M.'s, as expected, and another profile consistent with Iden. Allen was excluded from the mixture. The statistic for inclusion of Iden was 1 in 50,000.

On September 20, 2017, the Muskingum County Grand Jury returned a six-count indictment charging Iden as follows:

> Count one, kidnapping with sexual motivation, a felony of the first degree.

> Count two, rape, a felony of the first degree. This count contained a sexually violent predator specification based upon Iden's two prior convictions for sexual battery.

> Count three, attempted murder, a felony of the first degree.

> Count four, felonious assault, a felony of the second degree.

> Count five, kidnapping in order to terrorize of to inflict serious physical harm, a felony of the first degree.

> Count six, kidnapping with sexual motivation, a felony of the first degree. This count contained a sexual motivation specification and a sexually violent predator specification.

Iden pled not guilty to the charges and elected to proceed to a jury trial.

Before trial, on July 2, 2018, the state filed a notice of intent to introduce prior bad acts. In this motion the state outlined anticipated testimony from nine women Iden had sexually assaulted in similar, albeit in less violent fashion, in his car and in the same State Park or nearby rural area between 1994 and 1999. At trial, counsel for Iden objected to presentation of testimony from any of the women, but the trial court granted the motion over Iden's objection. The state ultimately presented testimony from five women, A.T., M.C., R.F.S., C.O., and T.K.M., all of whom testified Iden forced them to engage in sexual intercourse against their will, in his car, and in the Dillon State Park area.

The state further presented evidence from Iden's ex-wife, J.W., who testified they would go to the Dillon State Park area to have sex while they were dating.

J.M. testified as well, stating she recalled the evening of September 25-26, 1998, up until closing at the Beach Ridge Lounge. She does not recall leaving the Beach Ridge, nor anything that happened thereafter until she woke up in the hospital. She further had no recollection of anything she told law enforcement officials or anyone else immediately thereafter.

After hearing all the evidence, the jury was provided with instructions from the trial court which included a limiting instruction as to the evidence of other crimes, wrongs, or acts. After deliberating, the jury found Iden guilty as charged. He was subsequently sentenced to an aggregate total of 30 years to life and classified as a Tier III sex offender.

(Record, PAGEID # 130–43); *State v. Iden*, No. CT2019-0004, 2020 WL 412200, *1–5 (Ohio Ct. App. Jan. 21, 2020). The Court of Appeals affirmed his convictions and sentence on direct appeal. (Record, PAGEID # 144.)

Petitioner sought further review from the Supreme Court of Ohio, which declined to review the case. (Record, PAGEID # 145, 168); *State v. Iden*, 144 N.E.3d 445 (table) (Ohio 2020). Petitioner did not seek further review from the Supreme Court of the United States. (Petition, PAGEID # 3.) Any petition for a writ of certiorari to that Court would have been due 150 days after the Supreme Court of Ohio's decision, or by October 9, 2020. A more detailed discussion of this deadline follows in a later section.

Instead, Petitioner filed an application to reopen his direct appeal in the Ohio Court of Appeals on August 26, 2020. (Record, PAGEID # 169–74.) The Court of Appeals denied his application as untimely (*id*., PAGEID # 178–79), but the Supreme Court of Ohio summarily reversed and remanded for a proper time

calculation. (Record, PAGEID # 200); *State v. Iden*, 166 N.E.3d 30 (table) (Ohio 2021). On remand, the Court of Appeals found the application to reopen timely but denied it on its merits. (Record, PAGEID # 201–06.)

Petitioner again appealed to the Supreme Court of Ohio, which again declined further review. (Record, PAGEID # 207, 228); *State v. Iden*, 186 N.E.3d 835 (table) (Ohio 2022). It does not appear that Petitioner sought a writ of certiorari from the Supreme Court of the United States at this point either. Any such petition would have been due 90 days later, or by August 8, 2022. This deadline is also discussed further below.

On August 1, 2023, Petitioner submitted the instant Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Petition, PAGEID # 15.) It was opened on this Court's docket on August 4, 2023. Petitioner raises Grounds for Relief concerning the fairness of the prosecutor's introduction of other bad acts; the alleged ineffectiveness of trial and appellate counsel for failing to challenge the sufficiency of the indictment; and the violation of his speedy trial rights. After a preliminary review, the Court ordered Respondent to file an Answer. (ECF No. 2.)

Respondent sought leave to file a motion to dismiss rather than an answer, which the Court allowed. (ECF Nos. 6, 9.) Respondent filed a partial state-court record[2] and moved to dismiss the Petition as time-barred. (ECF Nos. 7, 8.)

---

[2] It appears that Respondent filed the written record of Petitioner's cases in state court but did not file the voluminous transcript of his arraignment, trial, and sentencing. (*See* Mot., PAGEID # 245, n.3.)

Petitioner filed a response to the motion, Respondent filed a reply, and Petitioner filed a sur-reply. (ECF Nos. 10, 11, 12.)

On January 25, 2024, non-party Joseph Clark filed a "Memorandum Regarding Petitioner's False Allegations and Attempt to Pull a Fraud Upon this Court." (ECF No. 14.) Petitioner requested that the Court disregard Mr. Clark's memorandum. (ECF No. 13.) Petitioner also filed "Supplemental Evidence" to support his opposition to dismissal. (ECF No. 15.) Respondent did not thereafter address Petitioner's sur-reply, Mr. Clark's memorandum, Petitioner's request for the Court to disregard it, or the supplemental evidence.

## II. ANALYSIS

### A. Proper Filings

Before discussing the timeliness issue underlying Respondent's Motion to Dismiss, the Court considers which filings are properly before it. This Court's Local Rules anticipate only two filings in response to a motion: a memorandum in opposition to the motion and a reply memorandum. S.D. Ohio Civ. R. 7.2(a)(2) ("No additional memoranda beyond those enumerated are permitted except upon leave of court for good cause shown.").

Here, Petitioner did not seek leave of Court to file his sur-reply or supplemental evidence. (ECF Nos. 12, 15.) He may have been unaware of the rule, but his *pro se* status does not exempt him from compliance. *See Greer v. Home Realty Co. of Memphis Inc.*, No. 2:07-cv-2639, 2010 WL 6512339, at *2 (W.D. Tenn. July 12, 2010) (quoting *Whitfield v. Snyder*, 263 F. App'x 518, 521 (7th Cir. 2008));

*Moore v. Westcomb*, No. 2:20-cv-179, 2021 WL 1851130, at *1 (W.D. Mich. May 10, 2021) (quoting *In re Sharwell*, 129 F.3d 1265 (6th Cir. 1997) (table)) ("While [the party] was proceeding *pro se* and may not have fully understood the rules of procedure, he was still required to comply with the rules; his pro se status does not exempt him from compliance."). The Court therefore will not consider and hereby **STRIKES** Petitioner's sur-reply and supplemental evidence (ECF Nos. 12, 15) because they were filed without leave of Court and contrary to rule.

Next is the memorandum filed by Mr. Clark, a non-party who assisted Petitioner with some of the state-court filings discussed in the previous section. (Disciplinary Counsel Letters, ECF No. 10, PAGEID # 264–71; Clark's Memo, PAGEID # 306–07.) Petitioner thought Mr. Clark was an attorney. (Disciplinary Counsel Letters, PAGEID # 264.) Apparently, he is not, though he admits practicing law. (*See* Clark's Memo, PAGEID #306–07.) Mr. Clark's activities have been investigated by the Office of Disciplinary Counsel of the Supreme Court of Ohio. (*See* Disciplinary Counsel Letters, PAGEID # 278–79.) Remarkably, Mr. Clark's memorandum appears to be directed toward *undermining* Petitioner's arguments seeking equitable tolling.

The Court is not aware of any reason that Mr. Clark should be permitted to file documents in this case. *See DRFP, LLC v. Republica Bolivariana de Venezuela*, No. 2:04-cv-793, 2012 WL 995288, at *2 (S.D. Ohio Mar. 22, 2012) (Sargus, J.) ("[T]here is little precedent which deals with the issue of when a non-party may properly file some document with the Court—perhaps because, for the most part,

12

non-parties understand that they do not have blanket permission to file papers in cases in which they are not involved, and seldom have any reason to attempt to do so."). In the ordinary habeas case, there is one petitioner (a state or federal prisoner or detainee) and one respondent (the person who has custody of the petitioner), with no one else involved. *See generally Rumsfeld v. Padilla,* 542 U.S. 426, 434–35 (2004). The Habeas Rules do not anticipate that other people may involve themselves in a habeas case to attempt to influence the Court in favor of (or, in this case, against) a party.[3]

Mr. Clark is not a party to this case and has no right to file in it. He did not seek leave to file his memorandum addressing the equitable tolling issue raised in Respondent's Motion to Dismiss and Petitioner's response. Further, there is no apparent reason why he, as a non-party, would be permitted to file a memorandum had he sought leave. For these reasons, the Court will not consider and hereby **STRIKES** Mr. Clark's memorandum (ECF No. 14). The Clerk is **DIRECTED** to remove Mr. Clark as an "Interested Party" from the docket. Further unsolicited filings by Mr. Clark in this case may lead to sanctions or filing restrictions.

Finally, the Court **DENIES** as moot Petitioner's request to disregard Mr. Clark's memorandum (ECF No. 13).

---

[3] The Habeas Rules do provide that the Federal Rules of Civil Procedure may be applied where they are not inconsistent with the Habeas Rules or statutory law. *See* Rule 12 of the Habeas Rules. The Court is not aware of any rule of civil procedure that allows non-parties to freely and without leave file memoranda in cases to which they are not a party. Formal intervention—which was not sought here—does not appear to be appropriate either and would require a proper filing that includes, among other things, the proposed intervenor's full address.

13

As a result of these decisions, the filings properly before the Court are the Petition (ECF No. 1); the partial state-court record (ECF No. 7); Respondent's Motion to Dismiss (ECF No. 8); Petitioner's Opposition to the Motion to Dismiss (ECF No. 10); and Respondent's Reply (ECF No. 11). Accordingly, the Court now turns to Respondent's Motion.

### B.    Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations on the filing of habeas corpus petitions in federal court. 28 U.S.C. § 2244(d). "Generally, the one-year statute of limitations for habeas petitions filed by state prisoners begins to run on 'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.'" *Hill v. Bauman*, No. 20-1091, 2020 WL 4346669, at *2 (6th Cir. May 21, 2020) (quoting 28 U.S.C. § 2244(d)(1)(A)). The statute lists alternative dates on which the statute might begin to run in certain cases, *see* § 2244(d)(1)(B)–(D), but Petitioner does not argue, nor does the record support, a finding that these alternatives apply here.[4]

---

[4] Specifically, there is no argument or indication in the record that an "impediment to filing an application created by State action in violation of the Constitution or laws of the United States [was] removed" (§ 2244(d)(1)(B)); that an applicable "constitutional right … was … newly recognized by the Supreme Court and made retroactive" (§ 2244(d)(1)(C)); or that the "factual predicate of the … claim presented" was discovered later (§ 2244(d)(1)(D)). Accordingly, the statute began to run as described in § 2244(d)(1)(A): on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Petitioner appears to acknowledge this in his Petition. (*See* Petition, PAGEID # 13 (asserting that the "[t]riggering event is the expiration of the time for filing a petition for a writ of certiorari in this case even if not sought[.]").)

The parties' first dispute in this case concerns when "the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Both agree that the time for seeking direct review includes or may include time for seeking a writ of certiorari in the Supreme Court of the United States. (Petition, PAGEID # 13; Mot., PAGEID # 249.) Here, Petitioner did not seek certiorari but could have done so on two occasions: (1) after the Supreme Court of Ohio declined to review the affirmance of his convictions on direct appeal, which occurred on May 12, 2020; and (2) after that court declined to review the denial of his application to reopen his direct appeal under Ohio Appellate Rule 26(B), which occurred on May 10, 2022. (*See* Record, PAGEID # 168, 228.)

Ordinarily, a petition for a writ of certiorari in the Supreme Court must be filed within 90 days of the final judgment on review. *See* Rule 13.1 of the Rules of the Supreme Court of the United States (effective July 1, 2019 through January 1, 2023).[5] But, for a period in 2020 and 2021, the Supreme Court extended this

---

[5] During that time, United States Supreme Court Rule 13.1 provided:

> Unless otherwise provided by law, a petition for a writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort or a United States court of appeals (including the United States Court of Appeals for the Armed Forces) is timely when it is fled with the Clerk of this Court within 90 days after entry of the judgment. A petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is fled with the Clerk within 90 days after entry of the order denying discretionary review.

deadline to 150 days due to difficulties caused by the COVID-19 pandemic. Its

Order stated:

> In light of the ongoing public health concerns relating to COVID-19, the following shall apply to cases prior to a ruling on a petition for a writ of certiorari:
>
>> **IT IS ORDERED** that the deadline to file any petition for a writ of certiorari due on or after the date of this order is extended to 150 days from the date of the lower court judgment, order denying discretionary review, or order denying a timely petition for rehearing.
>
>> \*     \*     \*
>
> These modifications will remain in effect until further order of the Court.

Miscellaneous Order Addressing the Extension of Filing Deadlines [COVID-19], 334

F.R.D. 801 (Mar. 19, 2020)[6]; *see also Wilson v. Braman*, No. 5:23-cv-10132, 2024 WL

691352, at \*2 (E.D. Mich. Feb. 20, 2024) (applying 150-day deadline in habeas case).

The extended deadline applied to judgments dated from March 19, 2020

through July 18, 2021, as described in a later Order:

> **IT IS ORDERED** that the Court's orders of March 19, 2020 [extending deadlines] and April 15, 2020 [concerning the filing of paper copies of documents] relating to COVID-19 are rescinded, subject to the clarifications set forth below.
>
> **IT IS FURTHER ORDERED** that, in any case in which the relevant lower court judgment, order denying discretionary review, or order denying a timely petition for rehearing was issued prior to July 19, 2021, the deadline to file a petition for a writ of certiorari remains extended to 150 days from the date of that judgment or order. In any case in which the relevant lower court judgment, order denying discretionary review, or order denying a timely petition for rehearing

---

[6] Also available at https://www.supremecourt.gov/orders/ordersofthecourt/19 (last accessed Sept. 5, 2024).

was issued on or after July 19, 2021, the deadline to file a petition for a
writ of certiorari is as provided by Rule 13.

Miscellaneous Order Rescinding COVID-19 Related Orders, 338 F.R.D. 801 (July

19, 2021).[7]

The first judgment at issue in this case was the Supreme Court of Ohio's

entry declining review on May 12, 2020, which is within the above-referenced

March 19, 2020 through July 18, 2021 window. (Record, PAGEID # 168.) The second

judgment at issue was that court's entry declining review on May 10, 2022, which is

outside the window. (*Id.*, PAGEID # 228.) Consequently, Petitioner had 150 days to

seek certiorari after the first entry and 90 days to seek certiorari after the second

entry. Any certiorari petitions were therefore due on October 9, 2020 (150 days after

May 12, 2020) and August 8, 2022 (90 days after May 10, 2022), respectively.

Petitioner asserts that the statute of limitations for this habeas corpus case

began to run after the second of these occasions—after the Supreme Court of Ohio

declined to review the denial of his application to reopen his direct appeal in 2022,

and he did not seek certiorari. (Petition, PAGEID # 13; Resp., PAGEID # 260–61.)

By Petitioner's calculation, the one-year statute began to run on August 10, 2022

(which is after the three months during which he could have sought certiorari). His

Petition filed on August 1, 2023—within one year of that date—would be timely.[8]

---

[7] Also available at https://www.supremecourt.gov/orders/ordersofthecourt/20
(last accessed Sept. 5, 2024).

[8] Absent any evidence to the contrary, the Court uses the date that a
petitioner signed a petition and deposited it for mailing to the Court as the date of
filing. *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (citing, among other

In contrast, Respondent asserts that the statute of limitations began to run after the first occasion—after the Supreme Court of Ohio declined to review the affirmance of Petitioner's conviction on direct appeal in 2020. (*See* Mot., PAGEID # 250.) Respondent calculates this as 90 days after the first entry, or by August 10, 2020. (*Id.*)

The resolution of this disagreement turns on whether proceedings to reopen a direct appeal under Ohio App. R. 26(B) are part of "direct review," after which the statute begins to run, or are considered "collateral review," which tolls an already running statute rather than delaying its start.[9]

Petitioner relies on a 2003 decision from the Sixth Circuit, *Lambert v. Warden, Ross Corr*, 81 F. App'x 1, 2 (6th Cir. 2003). (Resp., PAGEID # 260–63.) *Lambert*, in turn, relied on *White v. Schotten*, 201 F.3d 743 (6th Cir. 2000). While expressing some skepticism, the *Lambert* court held that it was "bound to follow the holding of *White* that [Ohio App. R.] 26(B) applications are part of direct review" and therefore delayed the running of the statute until such proceedings were concluded. *Lambert*, 81 F. App'x at 10.

---

sources, *Houston v. Lack*, 487 U.S. 266 (1988), and discussing the "prison mailbox rule"). Here, the Petition was signed on August 1, 2023. (Petition, PAGEID # 15.) With no contrary evidence, the Court uses August 1, 2023, as the date of filing.

[9] Under § 2244(d)(1)(A), the statute of limitations begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review[.]" And, under § 2244(d)(2), "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

However, the Sixth Circuit overruled *White* in 2005, concluding that:

> [T]he relevant state law, the distinctions between direct review and collateral review, and the structure and function of the AEDPA support the conclusion that a Rule 26(B) application to reopen is a collateral matter rather than part of direct review…[.] We therefore overrule *White v. Schotten.*

*Lopez v. Wilson*, 426 F.3d 339, 352 (6th Cir. 2005) (en banc) (footnote omitted).

Accordingly, *Lopez* implicitly overruled or undermined *Lambert* as well, because *Lambert* was explicitly based on *White* and because it is contrary to the binding decision in *Lopez*.[10] Since *Lopez*, federal courts in Ohio have routinely relied upon *Lopez* to hold that proceedings on an application to reopen are part of collateral review, which does not delay the start of the statute of limitations but can toll (or pause) a statute that is already running. *See, e.g.*, *Peyton v. Warden, Franklin Med. Ctr.*, No. 1:18-cv-684, 2019 WL 3892432, at *4 (S.D. Ohio Aug. 16, 2019) (Litkovitz, M.J.), *report and recommendation adopted*, 2019 WL 4562426 (S.D. Ohio Sept. 19, 2019) (Bertelsman, J.) (citing *Lopez*, 426 F.3d at 352) ("A Rule 26(B) application to reopen an appeal is a collateral, post-conviction relief procedure."); *Coley v. Bagley*,

---

[10] "En banc" review in the Sixth Circuit means that "all judges in regular active service at the time" heard and decided the case, rather than the usual three-judge panel. *See* 6 Cir. I.O.P. 35(c). Petitioner appears to suggest that the *Lopez* court could not overrule *White*, based on the rule that a panel of the Sixth Circuit cannot overrule a decision of a previous panel. (Memo Opp., PAGEID # 262.) Although this rule is indeed true, it does not apply to later en banc decisions. Thus, *Lopez*—as a decision of the court sitting en banc—did overrule the previous panel decision in *Lambert. See* 6 Cir. R. 32.1(b) ("Published panel opinions are binding on later panels. A published opinion is overruled only by the court en banc."); *Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 830 (6th Cir. 2019) (recognizing that "sitting en banc [in *Lopez*], we concluded that the [Ohio App. R.] 26(B) application is 'part of the collateral, postconviction process rather than direct review'").

No. 1:02-cv-457, 2010 WL 1375217, at *21 (N.D. Ohio Apr. 5, 2010), *aff'd*, 706 F.3d 741 (6th Cir. 2013) ("[T]he *Lopez* court held that, upon reviewing 'the relevant state law, the distinctions between direct review and collateral review, and the structure and function of the AEDPA,' the application to reopen procedure in Ohio was not part of the direct appeal but a post-conviction proceeding[.]").

Applying these principles here, the one-year statute of limitations for the instant habeas corpus matter began to run when "the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). That is 150 days after May 12, 2020, when the Supreme Court of Ohio declined to review the affirmance of Petitioner's conviction on direct appeal, and any petition for a writ of certiorari was due on Friday, October 9, 2020. (Record, PAGEID #168.) When no petition was filed, the statute began to run the next business day (Monday, October 12, 2020).[11]

However, the statute was immediately tolled by Petitioner's already-filed application to reopen his direct appeal, which had been filed a few weeks earlier on August 26, 2020. (Record, PAGEID # 159–174); 28 U.S.C. § 2244(d)(2). Proceedings on the application concluded on May 10, 2022, when the Supreme Court of Ohio declined to review the matter further. (Record, PAGEID # 228.) The one-year statute of limitations continued running the next day, Wednesday, May 11, 2022. It

---

[11] Under Fed. R. Civ. P. 6(a)(1)(C), "if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."

ran for one year (365 days) and expired on May 11, 2023. The Petition was thereafter filed on August 1, 2023. (Petition, PAGEID # 15.)

Petitioner argues that the statute should also be tolled during the time in which he could have filed his second petition for a writ of certiorari, during the 90 days after the Supreme Court of Ohio issued its May 10, 2022 entry. (Petition, PAGEID # 13; Resp., PAGEID # 261; *see also* Record, PAGEID # 228.) Respondent disagrees with this argument based on the Supreme Court's decision in *Lawrence v. Fla.*, 549 U.S. 327 (2007). (Reply, PAGEID # 287.) At issue in *Lawrence* was whether the habeas limitations period was tolled while a petition for certiorari was pending in the Court after the denial of relief in a collateral post-conviction proceeding. *Lawrence*, 549 U.S. at 331–32. The Supreme Court found in the negative:

> Read naturally, the text of the statute must mean that the statute of limitations is tolled only while state courts review the application. As we stated in *Carey v. Saffold,* 536 U.S. 214, 220, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002) (internal quotation marks omitted), a state postconviction application "remains pending" "until the application has achieved final resolution through the State's postconviction procedures." This [United States Supreme] Court is not a part of a "State's post-conviction procedures." State review ends when the state courts have finally resolved an application for state postconviction relief. After the State's highest court has issued its mandate or denied review, no other state avenues for relief remain open. And an application for state postconviction review no longer exists. All that remains is a separate certiorari petition pending before a *federal* court. The application for state postconviction review is therefore not "pending" after the state court's postconviction review is complete, and § 2244(d)(2) does not toll the 1-year limitations period during the pendency of a petition for certiorari.

*Id.* at 332 (emphasis in original). And as this Court has explained:

21

> Petitioner was not entitled to an additional 90 days of tolling of the limitations period in which he could have petitioned for certiorari to the United States Supreme Court from … the denial of his Rule 26(B) application[.] His Rule 26(B) application is considered an application for state post-conviction relief, *see Lopez v. Wilson*, 426 F.3d 339, 340-41 (6th Cir. 2005), which, unlike "direct review" of a conviction, is not subject to an additional 90 days of tolling. *Lawrence v. Florida*, 549 U.S. 327, 337 (2007).

*Raphael v. Warden, Madison Corr. Inst.*, No. 1:19-cv-795, 2020 WL 5634268, at *4

n.4 (S.D. Ohio Sept. 1, 2020) (Litkovitz, M.J.), *report and recommendation adopted*,

2020 WL 5632657 (S.D. Ohio Sept. 21, 2020) (McFarland, J.).

Based on this analysis, the Court concludes as follows:

a) The statute of limitations began running after the time expired for Petitioner to file his first petition for a writ of certiorari in the United States Supreme Court on October 12, 2020;

b) The statute of limitations was tolled while Petitioner's application to reopen was pending in state court but not during the time Petitioner could have filed a second petition for a writ of certiorari in the United States Supreme Court;

c) The statute of limitations under 28 U.S.C. § 2244(d) expired on May 11, 2023; and

d) The Petition was filed in this case on August 1, 2023, which is after the one-year statute of limitations expired.

The Petition is therefore time-barred unless there is a recognized exception that would allow review of the Petition despite its untimeliness. The parties have discussed one such doctrine (equitable tolling) but disagree as to whether it should apply here. (Mot., PAGEID # 251–56; Resp., PAGEID # 264–67; Reply, PAGEID # 287–91.)

### C.      Equitable Tolling

The statute of limitations for habeas corpus actions is subject to equitable tolling in appropriate cases. *Holland v. Florida*, 560 U.S. 631, 645 (2010). "Equitable tolling allows courts to review time-barred habeas petitions 'provided that a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 462 (6th Cir. 2012) (quoting *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010)). The doctrine "is used sparingly by federal courts." *Robertson*, 624 F.3d at 784 (citing *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th Cir. 2000)).

A petitioner is "entitled to equitable tolling" only if he shows that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing. *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016) (quoting *Holland*, 560 U.S. at 649). "[T]he second prong of the equitable tolling test is met only where the circumstances that caused a litigant's delay are both extraordinary and beyond [his] control." *Id.* at 257. "The petitioner bears the burden of demonstrating that he is entitled to equitable tolling." *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004) (quoting *McClendon v. Sherman*, 329 F.3d 490, 494 (6th Cir. 2003)).

Petitioner asserts that he meets the standard for equitable tolling given his interactions with Mr. Clark. (Resp., PAGEID # 264–67.) Considering the Court's decision to strike some of Petitioner's *pro se* filings and Mr. Clark's inappropriate attempt to influence these proceedings (ECF Nos. 12, 14, 15), the Court concludes

23

that additional briefing will be helpful in resolving the case. The Court will accordingly provide the parties with one further opportunity to address the equitable tolling doctrine and **RESERVES** a conclusion on whether it applies.

The parties shall also address the Petition itself and, if appropriate, the arguments therein. Respondent is **ORDERED** to file an Answer and any additional state-court record materials that are needed **within thirty (30) days** of this Order. Petitioner may file a Reply **within twenty-one (21) days** of Respondent's Answer. These filings shall be consistent with Rule 5 of the Habeas Rules. The Motion to Dismiss will be **HELD IN ABEYANCE** until the Answer and Reply are filed and the Court has had an opportunity to review them.

### III.    CONCLUSION

The following documents are **STRICKEN** from the docket of this case: Petitioner's sur-reply and supplemental evidence (ECF Nos. 12, 15) and the Mr. Clark's memorandum (ECF No. 14). Petitioner's motion to disregard Mr. Clark's memorandum (ECF No. 13) is **DENIED** as moot. The Clerk of Court is **DIRECTED** to remove Mr. Clark from the docket as an "Interested Party."

The Court **CONCLUDES** that the Petition was not filed within the one-year statute of limitations for federal habeas corpus actions but **RESERVES** a conclusion on the applicability of the equitable tolling doctrine. Respondent is **ORDERED** to file an Answer and any additional state-court record materials that are needed. Petitioner may file a Reply. Respondent's Motion to Dismiss (ECF No.

24

8) will be **HELD IN ABEYANCE** until the additional briefing and record materials

are provided.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**CHIEF UNITED STATES DISTRICT JUDGE**