**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION AT COLUMBUS**

JOHN J. IDEN,                                    :    Case No. 2:23-cv-2525
                                                 :
      Petitioner,                          :    District Judge Sarah D. Morrison
                                                 :    Magistrate Judge Chelsey M. Vascura
vs.                                              :
                                                 :
WARDEN, SOUTHEASTERN                             :
CORRECTIONAL INSTITUTION,                        :
                                                 :
      Respondent.                          :

---

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, has filed a *pro se* Petition for a writ of habeas corpus under 28
U.S.C. § 2254. The Petition (Doc. 1); Respondent's Motion to Dismiss (Doc. 8); Petitioner's
Response in Opposition (Doc. 10); Respondent's Reply (Doc. 11); Respondent's Answer/Return
of Writ (Docs. 17; 18); and Petitioner's Traverse (Doc. 21) are before the Court.

In a prior Order, the District Judge concluded that the Petition was not filed within the
one-year statute of limitations for habeas corpus actions but reserved a conclusion on whether the
equitable tolling doctrine applies. (Doc. 16). In additional briefing, both Petitioner and
Respondent have addressed the equitable-tolling issue, as well as newly raised procedural-default
issues and the merits of Petitioner's claims. (Docs. 18; 21). The Sixth Circuit has indicated "a
strong preference" for cases to be decided on the merits. *Shepard Claims Serv., Inc. v. William
Darrah & Assoc.*, 796 F.2d 190, 193-94 (6th Cir. 1986). In light of the Sixth Circuit's strong
preference to resolve cases on the merits, and because the parties' additional briefing
demonstrates that the Petition does not warrant habeas relief, the undersigned recommends
finding that the Petition fails on the merits, without reaching the issues of whether equitable-

tolling principles or the procedural-default doctrine apply. *See Carter v. Warden*, No. 1:19-cv-823, 2021 WL 858465, at \*4 (S.D. Ohio Mar. 8, 2021), *report and recommendation adopted sub nom. Carter v. Warden, Chillicothe Corr. Inst.*, 2022 WL 1746811 (S.D. Ohio May 31, 2022) (denying petition without reaching statute-of-limitations issue); *Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008) (denying petition without reaching procedural-default issue). In light of the above recommendation, the undersigned further recommends that Respondent's Motion to Dismiss (Doc. 8) be denied as moot.

## ANALYSIS

### I.      Summary of the Facts

Petitioner's convictions arise from events occurring between the dates of September 25th and 26th, 1998, following which the victim, J.M., was found critically injured in the Dillon State Park area. The Ohio Court of Appeals summarized the relevant facts and in accordance with 28 U.S.C. § 2254(e)(1) those facts are presumed correct on habeas review:

{¶ 2} On the morning of September 26, 1998, Robert Kremer drove to the Dillon State Park hunting area in Nashport Ohio to do some groundhog hunting. As he drove down a gravel access road into the park, he came upon a half-naked, blood-soaked woman standing in a field off the side of the road. Kremer stopped, grabbed a blanket he had in his truck and approached the woman.

{¶ 3} Kremer observed the woman was bleeding profusely from a horrible injury on the top of her head. She was shaking, appeared to be in shock, and could only say "help." Kremer wrapped the blanket around the woman and attempted to call 911, but had no cell phone reception. He put the woman into his truck, drove back to the main road and tried again. Unsuccessful, Kremer drove further up the road to a home and asked the occupants to phone for help.

{¶ 4} Muskingum County Sheriff's Office Lieutenant Franklin Pete Fisher arrived on the scene at approximately 9:30 a.m. to find the bloodied woman seated in Kremer's truck, wrapped in the blanket and otherwise wearing nothing but a t-shirt and one sock. He attempted to speak to the woman, but she was incoherent. Fisher could not even determine her name. Detective Steve Welker arrived second on the scene, and then Natural Resource Officer Mike Reed. Welker stayed with the woman to await an ambulance while Fisher and Reed followed Kremer back to

2

where he found the woman.

{¶ 5} The men searched the area where the woman was found. Fisher eventually located a pile of clothing – jeans, tennis shoes and underwear. Leading up to the area where the clothing was found, he additionally found bloody drag marks on the ground and a pool of blood. Fischer called for an evidence technician to process the scene.

{¶ 6} Meanwhile, Detective Welker accompanied the woman to Good Samaritan Hospital. Once there he could see she had a serious head injury. Her skull was visible in several places. She also had other injuries over her entire body which Welker photographed. Although she was in and out of consciousness, Welker eventually got the woman's name, J.M., a phone number for her aunt, and the fact that she had been physically and sexually assaulted by one person.

{¶ 7} Nurse Vickie Bell completed a rape kit on J.M. that morning which was later transferred to the Bureau of Criminal Investigations (BCI) for testing. She completed the appropriate steps and collected the appropriate samples.

{¶ 8} J.M's aunt, T.H arrived at the emergency room and spoke with law enforcement. She advised that J.M had been out with her friend Ricky Allen the evening before and that detectives should speak with him. J.M's mother wanted Allen arrested because before J.M. went into surgery, she told her mother Allen had done this. Later, however, J.M. told her aunt John Iden had done this to her. T.H. passed this information on to law enforcement.

{¶ 9} J.M's injuries were extensive, and potentially fatal. She was seen in the emergency room by a neurosurgeon, Dr. Michael Bruce Shannon. J.M had linear lacerations to her face, neck and extremities. These were torn-tissue lacerations as opposed to cut lacerations, some of which required sutures. J.M. additionally had bruises and linear abrasions on her arms, legs and buttocks consistent with the drag marks observed by Fischer at the scene. She also suffered a posterior depressed skull fracture. Shannon opined these injuries were inflicted, and not caused by a fall or other accident. He further opined J.M. had been held down, partially strangled, and that she had attempted to fight off her attacker.

{¶ 10} Dr. Shannon performed the surgery to repair J.M's skull. He removed debris and bone fragments and repaired a tear in the dura, the thick protective membrane encasing the brain, and from which J.M's spinal fluid was leaking. He then closed the scalp. J.M later required 2 additional surgeries. One when the bones in her skull became infected, and a second to repair the defect in her skull and add a skin graft to close the area. J.M. was left permanently scarred.

{¶ 11} J.M.'s brain injury may have been more severe had she not been hypothermic upon arrival in the emergency room. Still, the portion of J.M's brain that was injured impacted speech, understanding, and both short and long-term

3

memory. These deficits are permanent. J.M was unable to recall the event that left her with life-threatening injuries.

{¶ 12} A few days after arriving at the hospital, J.M. was also seen by gynecologist Dr. John Lepi. Lepi's vaginal exam revealed a half-inch tear at J.M.'s posterior fourchette, the area between her vagina and rectum. The tear had begun to heal on its own. Dr. Lepi further observed on the right side of J.M's vagina, and to the right of her cervix, an area of denuded epithelium. In other words, the inside surface layer of the vagina had been abraded. Lepi explained this was indicative of some type of forced entry which would not occur with normal intercourse.

{¶ 13} The subsequent investigation into this matter revealed that J.M. was at her neighbor's house around 12:30 a.m. where Ricky Allen was also visiting. When Allen said he was leaving to go to a bar, J.M. asked if she could ride along. The two went to a bar called the Lighthouse and split up. Later, while Allen was dancing, J.M. approached and introduced him to a man Allen believed she had picked up – Iden. She told Allen that they were leaving and Iden would give her a ride home.

{¶ 14} Allen got home around 3:30 a.m. Later that day, he discovered Detective Stutes of the Muskingum County Sheriff's Department wanted to talk to him about J.M. Allen spoke with Stutes, and cooperated fully. He told Stutes what he knew and permitted Stutes to search his car and seize the clothing he had been wearing the evening before. Later testing of these items revealed nothing of evidentiary value. Presented with a photo array, Allen identified Iden as the man J.M. left the Lighthouse with.

{¶ 15} Detective Stutes was able to speak with J.M on September 28, 1998, even though she was in critical condition. She identified her attacker as "Mark," said she worked with him at Union Tools, and that he had given her a ride to and from work a few times. She also recalled he drove a white Ford Tempo. She told Stutes they had been to the Lighthouse, City Limits, and Beach Ridge bars. She had no recollection, however, of events from the time she left the Beach Ridge until she woke up in the hospital.

{¶ 16} Following up on this information, detectives retraced J.M.'s travels on the night in question. They spoke with Lighthouse bartender Darlena Compton, who stated J.M. is her cousin and that she saw J.M. at the Lighthouse in the early morning hours of September 26, 1998. Compton stated J.M. arrived with Ricky Allen, but left with John Iden. Compton had not met Iden before that evening, but J.M. told her his name, that they worked together, and he was giving her a ride home. Compton also stated J.M. was drinking that night.

{¶ 17} Detectives next spoke with City Limits bartender Jennifer Harris-Winters. Harris-Winters recalled J.M. because she refused to serve her as she had no identification. J.M. was not happy about this and "created a bit of a scene" before

4

leaving. J.M. told Harrris-Winters she and the male she was with were going to go to the Beach Ridge Lounge where she could get served. Harris-Winters was not familiar with J.M. or the man she was with.

{¶ 18} Detectives then spoke with bartender Kim Erdy who worked at the Beach Ridge Lounge the morning in question. Erdy went to high school with J.M. and confirmed she was at the Beach Ridge after midnight with a younger looking, dark-haired male. Presented with a photo array, Erdy identified Iden as the man with J.M. Erdy recalled J.M. drinking shots of tequila, and Iden having a beer. Although Erdy knew the two stayed at the bar until closing, she did not see them leave.

{¶ 19} Detectives then spoke with bartender Glenna Sanborn, who is Erdy's mother and also familiar with J.M. She too was working at the Beach Ridge the morning in question. She recalled J.M. arriving at the bar with a young-looking male. He appeared so young that Sanborn had the doormen double check his identification. Presented with a photo array, Sanborn identified Iden as the man J.M. was with. She told detectives J.M. was drinking shots of tequila. At closing, she saw J.M. and Iden leave together. Additionally, across the street from the Beach Ridge was a truck stop that many frequented for breakfast after the bars closed. Sanborn was there at 3:00 a.m. for breakfast that morning and saw J.M. and Iden walking around the truck stop.

{¶ 20} Gregory Zigan, who knew J.M. from high school, and had previously met Iden through a friend, was also at the truck stop that morning visiting his mother-in-law who worked there. He too advised detectives that he saw J.M. and Iden walking around the truck stop and picked Iden out of a photo array. He further advised that Iden sometimes went by the name of Marcus, but his real name was John.

{¶ 21} As evidence quickly turned the investigation from Allen to Iden, detectives set out to find Iden. They arrived at his home just as he was leaving in a white Ford Tempo. He was stopped, and the vehicle seized.

{¶ 22} Detective Stutes spoke with Iden regarding his whereabouts on September 25-26, 1998. According to Iden he was at the Eagles with his mother and stepfather where he saw J.M. and another woman around 12:15 a.m. The three then went to the Beach Ridge where J.M. did shots and he had a beer. Iden stated he lost track of the other woman. He told Stutes J.M. was talking to one of the barmaids and another man who offered her a ride home. He intervened and said he was J.M.'s ride. Iden stated that shortly thereafter, he told J.M. they were leaving. He recalled it was around 1:00 or 1:15 a.m. Iden described J.M. as "bomb-shelled" and "totally out of it." He told Stutes she passed out as soon as she got into his Ford Tempo, and that he took her straight home. Iden said he knew J.M. lived with her aunt on Church Street because they worked together and he gave her a ride to and from work from time to time. He claimed he dropped her off there, needing to first shake her awake and then practically carry her to the front porch where he left her because

she did not want her aunt to know she had been out drinking. Iden claimed he was in bed by 2:30 a.m. He additionally claimed he was unfamiliar with the Dillon State Park area.

{¶ 23} Muskingum County Sheriff's Department evidence technician Timothy Hartmeyer processed the scene at Dillon State Park as well as Iden's Ford Tempo. At the crime scene, Hartmeyer had recovered several items of clothing, shoes, underwear, and a pair of urine-soaked jeans.

{¶ 24} While processing the Tempo, Hartmeyer noted that the inside of the right front door of the car looked as though it had very recently been wiped down as it was clean and the rest of the interior of the car was covered with a layer of dust. Hartmeyer took several samples from suspect stains on the passenger side of the car, inside and out. It also appeared to Hartmeyer that the passenger side front floor mat had recently been removed, as the carpet underneath where it had been was clearly indented in the shape of the missing mat. He further noted that there were balls of fiber at the crime scene which were consistent with the carpet in the Tempo's floorboards. On the passenger seat of the car was a tool box. Inside, there were tools with suspect stains, and in the bottom of the box, fresh soapy water. In the trunk of the Tempo, there was a spare tire and a jack, but no tire iron.

{¶ 25} On October 22, 1998, Detective Stutes requested further samples from Iden's car because preliminary lab reports identified areas of blood. Ultimately, a blood stain from inside the rear passenger side door was below reporting standards, but consistent with J.M. Stains from the tools yielded no reportable results.

{¶ 26} Sometime shortly after the events of September 25-26, 1998, detectives spoke with Iden's girlfriend at the time, Crystal Dunlap. Dunlap was also friends with J.M. The first time detectives spoke with her, she offered nothing as she feared Iden. The second time, however, Dunlap stated she had become suspicious of Iden's possible involvement in J.M.'s rape and assault and asked him about the matter while she was riding in his car. Iden responded by holding a crowbar across Dunlap's body and stating "I did it to her and I can do it to you."

{¶ 27} In 1998, J.M's rape kit was processed at the BCI. The vaginal swabs and smears tested and were negative for semen. As per policy at that time, therefore, no further testing was done. In 2016, however, as part of a statewide initiative to re-test rape kits using today's advanced technology, J.M's rape kit was resubmitted for testing. Upon retesting, the perianal swab (the skin around the outside of the rectum) from the kit identified a mixture of DNA, J.M.'s, as expected, and another profile consistent with Iden. Allen was excluded from the mixture. The statistic for inclusion of Iden was 1 in 50,000.

{¶ 28} On September 20, 2017, the Muskingum County Grand Jury returned a six-count indictment charging Iden as follows:

{¶ 29} Count one, kidnapping with sexual motivation, a felony of the first degree.

{¶ 30} Count two, rape, a felony of the first degree.  This count contained a sexually violent predator specification based upon Iden's two prior convictions for sexual battery.

{¶ 31} Count three, attempted murder, a felony of the first degree.

{¶ 32} Count four, felonious assault, a felony of the second degree.

{¶ 33} Count five, Kidnapping in order to terrorize of to inflict serious physical harm, a felony of the first degree.

{¶ 34} Count six, kidnapping with sexual motivation, a felony of the first degree.  This count contained a sexual motivation specification and a sexually violent predator specification.

{¶ 35} Iden pled not guilty to the charges and elected to proceed to a jury trial.

{¶ 36} Before trial, on July 2, 2018, the state filed a notice of intent to introduce prior bad acts.  In this motion the state outlined anticipated testimony from nine women Iden had sexually assaulted in similar, albeit in less violent fashion, in his car and in the same State Park or nearby rural area between 1994 and 1999.  At trial, counsel for Iden objected to presentation of testimony from any of the women, but the trial court granted the motion over Iden's objection.  The state ultimately presented testimony from five women, A.T, M.C, R.F.S, C.O, and T.K.M., all of whom testified Iden forced them to engage in sexual intercourse against their will, in his car, and in the Dillon State Park area.

{¶ 37} The state further presented evidence from Iden's ex-wife, J.W., who testified they would go to the Dillon State Park area to have sex while they were dating.

{¶ 38} J.M. testified as well, stating she recalled the evening of September 25-26, 1998, up until closing at the Beach Ridge Lounge.  She does not recall leaving the Beach Ridge, nor anything that happened thereafter until she woke up in the hospital.  She further had no recollection of anything she told law enforcement officials or anyone else immediately thereafter.

{¶ 39} After hearing all the evidence, the jury was provided with instructions from the trial court which included a limiting instruction as to the evidence of other crimes, wrongs, or acts.  After deliberating, the jury found Iden guilty as charged. He was subsequently sentenced to an aggregate total of 30 years to life and classified as a Tier III sex offender.

(Doc. 17, Ex. 21, at PageID 449-57).

7

## II.       Procedural Background

The procedural history following Petitioner's convictions is fully set forth in a prior Order by the Court.  (Doc. 16, at PageID 344-53).  Because the undersigned has elected to overlook any time and procedural bars applicable to this case, the Court turns directly to Petitioner's federal habeas petition, without reiterating that history, except as is necessary to advance the undersigned's analysis and recommendations herein.

## III.      Federal Habeas Corpus Petition

Petitioner raises the following three grounds for relief in his Petition:

**GROUND ONE**: Petitioner has been denied his 5th and 14th amendment rights to a fair trial and due process afforded by the United States Constitution[.]

**Supporting Facts:**  6 witnesses admitted over objection improperly as to prejudicial other acts[.]   [O]ther acts testimony was cumulative increasing prejudicial influence on jury[.]  Use of this other acts evidence by the prosecutor during closing arguments is prosecutorial misconduct, further prejudicing petitioner with the jury[.]  The entire trial, almost every day of trial infected with this error—plain error[.]  Curative or limiting instructions were ineffective to cure the "harmless error."

**GROUND TWO**: Ineffective assistance of trial and appellant counsel for failing to claim that petitioner's indictment was insufficient, should have been quashed.

**Supporting Facts:**  6th and 14th amendment rights of United States Constitution were violated by ineffective assistance of counsel and indictment stands in violation of 14th amendment right to due process.  Indictment does not protect petitioner from double jeopardy to plead a formal acquittal or conviction.  Indictment has carbon copy counts, does not descend the particulars to put petitioner on notice as to nature of charges against him[.]

**GROUND THREE**: Petitioner's state and federally protected constitutional right to a speedy trial violated.   Trial and appellate counsel rendered ineffective assistance of counsel[.]

**Supporting Facts**:  Was held in county jail 471 days waiting for trial[.]  Only signed a continuance, not an unlimited waiver[.]  Several unreasonable sua sponte state continuances granted by trial court over objection after trial dates set[.]  Could not properly defend case in jail which caused extreme anxiety and prejudiced my ability to defend myself.  I could not talk over the jail phones with attorney because

8

the jail records the calls. Lawyer only visited 2 or three times in 15 months in the jail prior to trial.

(Doc. 1, at PageID 5-9).

### A. Governing Legal Standard

Review of the Petition is governed by the standard set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 599–600 (quoting *Williams*, 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* at 600. As the Sixth Circuit explained in *Otte*:

9

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g.*, *Cullen v. Pinholster*, [563] U.S. [170, 181-82], 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*.... This is a "substantially higher threshold."... To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter*, [562] U.S. [86, 98-99], 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original).  The Supreme Court extended its ruling in *Harrington* to hold that when a state court rules against a defendant in an opinion that "addresses some issues but does not expressly address the federal claim in question," the federal habeas court must presume, subject to rebuttal, that the federal claim was "adjudicated on the merits" and thus subject to the "restrictive standard of review" set out in § 2254(d).  *See Johnson v. Williams*, 568 U.S. 289, 292 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents."  *Harrington*, 562 U.S. at 102.  In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 103.

The Supreme Court has made it clear that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that

10

controlled at the time of the last state-court adjudication on the merits, as opposed to when the

conviction became "final." *Greene v. Fisher*, 565 U.S. 34, 38–40 (2011); *cf. Otte*, 654 F.3d at

600 (citing *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim

addressed by the state courts, the federal habeas court must "look to Supreme Court cases

already decided at the time the state court made its decision"). In *Greene*, 565 U.S. at 38, the

Court explained:

> [W]e held last term in *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 179
> L.Ed.2d 557 (2011), that review under § 2254(d)(1) is limited to the record that was
> before the state court that adjudicated the prisoner's claim on the merits. We said
> that the provision's "backward-looking language requires an examination of the
> state-court decision at the time it was made." *Id.*, at 182, 131 S.Ct. at 1398. The
> reasoning of *Cullen* determines the result here. As we explained, § 2254(d)(1)
> requires federal courts to "focu[s] on what a state court knew and did," and to
> measure state-court decisions *as of 'the time the state court renders its decision*.' "
> *Id.*, at 182, 131 S.Ct. at 1399 (quoting *Lockyer v. Andrade*, 538 U.S. [at] 71-72, 123
> S.Ct. 1166 . . .; emphasis added).

Decisions by lower courts are relevant "to the extent [they] already reviewed and

interpreted the relevant Supreme Court case law to determine whether a legal principle or right

had been clearly established by the Supreme Court." *Otte*, 654 F.3d at 600 (quoting *Landrum v.*

*Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)). The writ may issue only if the application of

clearly established federal law is objectively unreasonable "in light of the holdings, as opposed

to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision."

*McGhee v. Yukins*, 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams*, 529 U.S. at 412).

### B. Ground One Should Be Denied

In Ground One, Petitioner asserts trial court error in the admission of, and prosecutorial

misconduct in the reference during closing argument to, testimony from five women, who were

not victims in the case, that Petitioner had raped them in his car in the Dillon State Park area and

from his ex-wife that they would go to the Dillon State Park area to have sex while they were

11

dating. (Doc. 1, at PageID 5, 21-28).

Although Petitioner has framed Ground One in his Petition as both trial-court error and prosecutorial misconduct, "it amounts in the end to a challenge to the trial court's decision to allow the introduction of this evidence." *Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 2009) (citing *Coleman v. Mitchell,* 268 F.3d 417, 439 (6th Cir. 2001)). Indeed, "[a] prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." *Id*. (quoting *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008)). "[A] trial court violates due process only if admitting the evidence under state law violates 'fundamental conceptions of justice.'" *Id*. (quoting *Dowling v. United States,* 493 U.S. 342, 352-53 (1990)).

The Ohio Court of Appeals considered this claim on direct appeal as follows:

{¶ 42} In his sole assignment of error, Iden argues the trial court erred in admitting the testimony of alleged victims A.T., M.C., R.F.S., C.O., T.K.M., and Iden's ex-wife, J.W. as their testimony was not inextricably related to the charged crimes so as to be part of the same plan, scheme, or system, was not admissible to prove a behavioral fingerprint, and was more prejudicial than probative. We disagree.

{¶ 43} The admission or exclusion of relevant evidence rests in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). Generally, all relevant evidence is admissible. Evid. R. 402. Abuse of discretion means more than an error of law or judgment. Rather, it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). Absent an abuse of discretion resulting in material prejudice to the defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard. *Sage*, 31 Ohio St.3d 173.

{¶ 44} Rule 404(B) of the Ohio Rules of Evidence and R.C. 2945.59 preclude admission of other acts evidence to prove a character trait in order to demonstrate conduct in conformity with that trait. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 16. There are, however, exceptions to the rule. Evidence of other crimes, wrongs, or acts of an accused tending to show the plan with which an act is done may be admissible for other purposes, such as those listed in Evid. R. 404(B); to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In considering other acts evidence, trial courts should conduct a three-step analysis. The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would

12

be without the evidence.  Evid. R. 401.  Next, the trial court is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid. R. 404(B), proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  Finally, a trial court is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.  *See* Evid. R 403, *Williams*, at ¶¶ 19-20.

{¶ 45} "Because R.C. 2945.59 and Evid. R. 404(B) codify an exception to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict."  *State v. Broom*, 40 Ohio St.3d 277, 281-82, 533 N.E.2d 682, (1988).  As cautioned by the Ohio Supreme Court in *State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616 (1994), ". . . we therefore must be careful . . . to recognize the distinction between evidence which shows that a defendant is the type of person who might commit a particular crime and evidence which shows that a defendant is the person who committed a particular crime."  *Id.* at 530, 634 N.E.2d 616.  Evidence to prove the 'type' of person the defendant is to show he acted in conformity therewith is barred by Evid. R. 404(B).

{¶ 46} In this matter, the state was permitted to introduce the testimony of five women Iden raped in similar fashion to that of J.M. – in his car in the area of the Dillon State Park, and threatened with harm if or when they resisted.  The state was further permitted to present testimony from Iden's ex-wife, to testify that she and Iden engaged in consensual sex in the Dillon State Park area when they were dating.

{¶ 47} In its July 2, 2018 State's Notice of Intent to Use Prior Bad Acts, the state argued this testimony was necessary to establish Iden's plan or method of operation. At trial, counsel for Iden objected to any of the women being called to testify to prior bad acts of Iden.  The state responded that it should be permitted to introduce the evidence because identity was at issue, and the testimony of the women was required to identify J.M.'s attacker.  T. 508-510.  Here on appeal, the state argues the evidence was relevant to prove Iden's motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident.  The state further argues the evidence was presented to identify the individual who kidnapped and assaulted J.M. because she could not remember the attack.

{¶ 48} We find the trial court did not abuse its discretion in admitting the forgoing testimony.  Iden claimed he dropped J.M. off at home, denying he raped or assaulted her.  J.M. was unable to recall what happened after she left the Beach Ridge lounge on the evening in question.  DNA testing of J.M.'s rape kit produced a DNA statistic which was less than ideal.  Testimony from Iden's previous victims established a modus operandi on the part of Iden.  A modus operandi is admissible because "it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify

13

the defendant as the perpetrator." *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994).

{¶ 49} The manner in which Iden raped J.M. was very similar to the manner in which he raped the other women who testified.  Each time Iden first made the woman a passenger in his vehicle which he drove to the Dillon State Park Area, or a nearby secluded area where each woman had no hope of running from Iden, nor anyone hearing their pleas for help.  He then forced each woman to engage in sexual intercourse against their will, and under threat of bodily harm if they resisted.  The only difference between J.M.'s situation and the others is J.M. had the audacity to fight Iden, and he made good his threat, nearly killing J.M in the process.

{¶ 50} Accordingly, we overrule the sole assignment of error.

(Doc. 17, Ex. 21, at PageID 457-60).  The Ohio Supreme Court denied further review.  (*Id*., Ex. 27, at PageID 486).

Petitioner has failed to demonstrate that the Ohio Court of Appeals' decision was an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).  To begin, any claim by Petitioner that the trial court violated Ohio evidentiary rules by admitting other-acts evidence is not cognizable.  "[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus."  *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (a federal habeas court does not "reexamine state-court determinations on state-law questions," including the admissibility of evidence).[1]

Moreover, Petitioner has failed to show that the admission of other acts evidence violated due process.  The Supreme Court has not held that "other acts" evidence is so extremely unfair

---

[1]Because it is not the role of the federal courts "to re-examine state-court determinations of state-law questions," *Estelle,* 502 U.S. at 67–68, the Court need not dwell long on Petitioner's assertion that an earlier version of the Ohio Court of Appeals' decision determined the other-acts evidence to be erroneously admitted but the error to be harmless. (*See* Doc. 1, at PageID 16, 21-23).  This Court "defer[s] to the 'last reasoned state-court opinion' that addressed the matter."  *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 462 (6th Cir. 2015) (quoting *Ylst v. Nunnemaker*, 501 U.S. 7907, 804 (1991)).  Further, the alleged modification does not affect this Court's analysis of Ground One.  As set forth herein, there is no clearly established Supreme Court precedent holding that a state court violates due process by allowing the admission of other-acts evidence.  *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

that its admission violates fundamental conceptions of justice.  *See Dowling v. United States*, 493 U.S. 342, 352-54 (1990).  As a result, "there is no clearly established Supreme Court law which holds that a state violates a habeas petitioner's due process rights by admitting propensity evidence in the form of 'other acts' evidence."  *Harris v. Macauley*, No. 2:22-CV-11301, 2023 WL 8721416, at *8 (E.D. Mich. Dec. 18, 2023), *certificate of appealability denied,* No. 24-1060, 2024 WL 3526409 (6th Cir. June 12, 2024) (citing *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003)).  Thus, "there is no Supreme Court precedent that the state court decisions could be deemed 'contrary to' under 28 U.S.C. § 2254(d)(1)."  *Graham v. McCullick*, No. 2:19-CV-10638, 2019 WL 5552342, at *7 (E.D. Mich. Oct. 28, 2019).  And "[b]ecause there was no constitutional violation in the admission of evidence of other bad acts, the state court decision was 'far from' an unreasonable determination of the facts in light of the evidence presented."  *Kupres v. Skipper*, No. 1:18-CV-807, 2018 WL 3950916, at *4 (W.D. Mich. Aug. 17, 2018) (citing *Clark v. O'Dea*, 257 F.3d 498, 502 (6th Cir. 2001); *Bugh*, 329 F.3d at 512).

Accordingly, Ground One should be denied.

## C.    Ground Two Should Be Denied

In Ground Two, Petitioner asserts that appellate counsel was ineffective for failing to raise an ineffective-assistance-of-trial-counsel claim based on trial counsel's failure to challenge the sufficiency of his indictment under the United States Constitution.  (Doc. 1, at PageID 7, 29-30).

When, as here, "an ineffective assistance of counsel claim rests on the deficient selection of appellate issues, the primary, if not single, focus of the court is the merit or lack thereof of the unraised issues."  *Jaynes v. Mitchell*, No. CA 03-11582, 2015 WL 881245, at *10 (D. Mass. Mar. 2, 2015), *subsequently aff'd*, 824 F.3d 187 (1st Cir. 2016) (quoting *Rosenthal v. O'Brien,*

15

814 F.Supp.2d 39, 57 (D. Mass. 2011)). As such, denial of the unraised issue "will necessarily

lead to denial of the ineffective assistance of appellate counsel claim." *Id.*

The Ohio Court of Appeals considered this claim as follows in the proceedings on

Petitioner's application to reopen his direct appeal under Ohio App. Rule 26(b):

> Iden first baldly argues his indictment failed to adequately advise him of the nature
> of the charges against him. Iden fails to explain which of the six counts or
> numerous specifications contained in the indictment were unclear or why.
>
> A criminal defendant is entitled to an indictment which sets forth the "nature and
> cause of the accusation." *State v. Gingell*, 7 Ohio App.3d 364, 366, 455 N.E.2d
> 1066 (1982). The state is required to aver all material elements of an offense within
> an indictment so that the defendant has adequate notice and an opportunity to
> defend and the additional protection from future prosecution for the same offending
> conduct. *Id.*
>
> The indictment charges Iden with six counts. Each count lists the criminal statute
> he was accused of violating, a description of the purported conduct that tracks the
> language of the statute, includes the elements of each offense and the dates upon
> which Iden was accused of committing the offenses. An indictment that tracks the
> language of the charged offense, identifies the offense by statute, and includes each
> element of the offense is sufficient to provide notice to the accused of the pending
> charges. *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26.
>
> We therefore reject Iden's first proposed assignment of error.

(Doc. 17, Ex., 37, at PageID 521-22). The Ohio Supreme Court declined further review. (*Id.*,

Ex. 41, at PageID 546).

Petitioner has failed to demonstrate that the Ohio Court of Appeals' decision was an

unreasonable application of Supreme Court precedent or based on an unreasonable determination

of the facts. *See* 28 U.S.C. § 2254(d). The court correctly laid out the two-prong *Strickland v.*

*Washington* test—requiring a defendant to demonstrate that (1) his counsel's performance was

deficient, and (2) he was prejudiced as a result—in analyzing Petitioner's Sixth Amendment

ineffective assistance of counsel claim. (*Id.* at PageID 520) (citing *Strickland v. Washington,*

466 U.S. 668 (1984)). To satisfy the performance standard, the defendant must "show that

16

counsel's representation fell below an objective standard of reasonableness."  466 U.S. at 688.

To satisfy the prejudice prong, "[t]he defendant must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different."  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine

confidence in the outcome."  *Id.*  Here, the state appellate court found no violation of the

*Strickland* standard because the indictment was sufficient to provide notice to Petitioner of the

pending charges.  (Doc. 17, Ex., 37, at PageID 521-22).

Although the state appellate court discussed this claim in terms of Ohio law, Petitioner

raised federal constitutional grounds in his Rule 26(b) application.  (Doc. 17, Ex. 28, at PageID

489).  A state court decision can constitute an "adjudication on the merits" entitled to deference

under 28 U.S.C. § 2254(d)(1) even if the state court does not explicitly refer to the federal claim

or to relevant federal case law.  *See Harrington*, 562 U.S. at 98.  The Court therefore presumes

the Ohio Court of Appeals decided Petitioner's constitutional sufficiency-of-the-indictment

claim on the merits.  *See Brown v. Bobby*, 656 F.3d 325, 329 (6th Cir. 2011) ("When a federal

claim has been presented to a state court and the state court has denied relief, it may be presumed

that the state court adjudicated the claim on the merits in the absence of any indication or state-

law procedural principles to the contrary.") (quoting *Harrington,* 562 U.S. at 98).  Moreover,

while the state appellate court did not expressly cite federal law, it employed the same standards

as has been adopted into Ohio law.  (*See* Doc. 17, Ex., 37, at PageID 521-22) (citing *Gingell*, 455

N.E.2d at 1070 (applying "the respective provisions of the Ohio and United States

Constitutions").

When a state court decides on the merits a federal constitutional claim that is later

presented to a federal habeas court, the federal court must defer to the state court decision unless

17

that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court.  28 U.S.C. § 2254(d)(1); *Harrington*, 562 U.S. at 105; *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.  The Supreme Court has described "[t]he standards created by *Strickland* and § 2254(d)" as "'highly deferential' . . . and when the two apply in tandem, review is 'doubly' so."  *Harrington*, 562 U.S. at 105 (internal citations omitted).

Petitioner has failed to overcome the double and highly deferential standards applicable to this Court's review of his *Strickland* claim.  "[D]ue process mandates only that the indictment provide the defendant with 'fair notice of the charges against him to permit adequate preparation of his defense.'"  *Williams v. Haviland,* 467 F.3d 527, 535 (6th Cir. 2006) (quoting *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984)).  Petitioner's indictment placed him on notice that he was charged with three counts of kidnapping (Counts One, Five, and Six), each count under a separate subsection of the kidnapping statute (Ohio Rev. Code §§ 2905.01(A)(4), 2905.01(A)(3), and 2905.01(B)(1), respectively); one count of rape (Count Two) (under Ohio Rev. Code § 2907.02(A)(2)); one count of attempt to commit murder (Count Three) (under Ohio Rev. Code § 2923.02(A)), and one count of felonious assault (Count Four) (under Ohio Rev. Code § 2903.11(A)(2)).  The indictment also informed Petitioner that Counts Two and Six contained sexually violent predator specifications and that Count Six also contained a sexual motivation specification.  (*See* Doc. 17, Ex. 1, at PageID 372-74).  As noted by the Ohio Court of Appeals, the indictment tracked the language of the applicable statutes, specified the essential elements of the charges against Petitioner, and included the dates of the offenses.  (*Id*., Ex., 37, at PageID

522).  Additionally, the indictment identified the victim, J.M..  (*See Id.*, Ex. 1, at PageID 372-74).  With such information, Petitioner had sufficient notice to adequately prepare a defense to the allegations.  *See Flora v. Sheets*, No. 1:07-cv-1477, 2008 WL 2986284, at *11 (N.D. Ohio July 31, 2008) (finding indictment constitutionally sufficient where it recited the language of the charging statutes, identified the victim, and stated the date on which the charges occurred).

Accordingly, there is no reasonable probability that a constitutional challenge to the sufficiency of the indictment would have succeeded.  *See Perry v. Tibbles*, No. 5:12-cv-802, 2013 WL 4680483, at *20 (N.D. Ohio Aug. 30, 2013) (finding "there was simply no reason for counsel to challenge" an indictment that complies with the law).  Ground Two should therefore be denied.[2]

### D.     Ground Three Should Be Denied

In Ground Three, Petitioner asserts that appellate counsel was ineffective for failing to raise an ineffective-assistance-of-trial-counsel claim based on trial counsel's failure to assert Petitioner's right to a speedy trial under the state and federal constitutions.  (Doc. 1, at PageID 8-9, 34).

The Ohio Court of Appeals considered this claim as follows in Petitioner's Rule 26(b) proceedings:

Iden next argues, without providing any calculation or details, that his right to a

---

[2]Petitioner attempts to raise a new claim of ineffective assistance of counsel in his Traverse, asserting that trial counsel also failed to object to the inclusion in the indictment of the felonious assault charge, as it was ultimately dismissed by the state prior to sentencing on statute-of-limitations grounds.  (Doc. 21, at PageID 1630; *see also* Doc. 17-2, at PageID 1521-22 (Sentencing Transcript)).  However, Petitioner may not add new claims that are not in the Petition by raising such claims in the Traverse.  *Jalowiec v. Bradshaw*, 657 F.3d 293, 311–12 (6th Cir. 2011) (citing *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005)).  Petitioner's new ineffective-assistance-of-counsel claim should therefore be **DISMISSED** as improperly raised in his Traverse.  Moreover, even if this Court would reach the merits of the new claim, Petitioner has failed to show that he was prejudiced by counsel's allegedly deficient performance.  *Strickland*, 466 U.S. at 687.  Given Petitioner's attempted murder, rape, and kidnapping charges, Petitioner has not shown how the exclusion of this charge before trial would have altered the evidence presented to the jury or counsel's strategy during trial.  *See McCallister v. Williams*, No. 2:18-CV-01140, 2024 WL 3293729, at *9 (D. Nev. July 3, 2024) (finding no prejudice where certain charges were dismissed after trial because "the conduct underlying the . . . charges would have been admissible regardless").

speedy trial was violated.

R.C. 2945. 71 states in relevant part:

> (C) A person against whom a charge of felony is pending:
>
> * * *
> (2) Shall be brought to trial within two hundred seventy days after his arrest.
>
> (D) For purposes of computing time under divisions (A), (B), and (C) of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days.

R.C. 2945.72 sets forth events which serve to toll the speedy trial time limit. It provides in relevant part:

> (C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon his request as required by law;
>
> * * *
> (E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;
>
> [***]
>
> (H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion;

We have examined the record and note Iden's indictment was filed on September 20, 2017. He was arrested the same day. Iden appeared at his arraignment on September 27, 2017 with Attorney Mortimer "for purposes of arraignment only." Docket Item 5 page one. Iden retained counsel on October 2, 2017. On the same day, counsel for Iden filed a notice of appearance, a motion for discovery and for a bill of particulars, tolling time. It is unclear from the record when the state provided discovery. On November 29, 2017, Iden filed a motion to continue his trial which was scheduled for December 7, 2017. This motion is the only clue as to when the state provided discovery as counsel for Iden requested the continuance in order to review the voluminous discovery delivered to counsel "during the week of November 6." Docket Item 11, page 1. Also on November 29, Iden signed a waiver of his speedy trial rights. Docket Item 12. It appears Iden was held in jail pending

bond.  The state was therefore required to bring Iden to trial within 90 days.  Even if we ignore tolling events, however, only 70 days elapsed before Iden signed a waiver of his speedy trial rights.

The second proposed assignment of error is without merit.

(Doc. 17, Ex. 37, at PageID 522-524).  As set forth above, the Ohio Supreme Court denied further review.  (*Id*., Ex. 41, at PageID 546).

As with Ground Two, the state appellate court discussed this claim in terms of Ohio law. However, because Petitioner raised it under state and federal law in his Rule 26(b) application (*see* Doc. 17, Ex. 28, at PageID 490), the Court presumes the Ohio Court of Appeals decided both aspects of the claim on the merits, *see Brown*, 656 F.3d at 329, and affords the decision appropriate deference under *Harrington*, 562 U.S. at 105.

Petitioner has not established that he is entitled to habeas relief on this claim.  As an initial matter, because the state courts are the final authority on state-law issues, this Court must defer to and is bound by the state court's interpretation of state law.  *See Estelle*, 502 U.S. at 67–68.  Because the state court held that there was no speedy-trial violation under state law, Petitioner cannot show that his attorney was ineffective for failing to raise such a challenge.  *See Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("[C]ounsel cannot be ineffective for a failure to raise an issue that lacks merit").

Nor is the state appellate court's decision an unreasonable application of Supreme Court precedent.  The Sixth Amendment guarantees a defendant the right to a speedy trial, which involves a fact-intensive inquiry requiring the balancing of (1) "whether [the] delay before trial was uncommonly long;" (2) "whether the government or the criminal defendant is more to blame for the delay;" (3) "whether, in due course, the defendant asserted his right to a speedy trial;" and (4) "whether he suffered prejudice as the delay's result." *Doggett v. United States,* 505 U.S. 647,

21

651, 655 (1992); *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *see also Wilson v. Mitchell*, 250 F.3d 388, 394 (6th Cir. 2001).

"The first factor serves a dual function." *United States v. Schreane*, 331 F.3d 548, 553 (6th Cir. 2003). First, as a threshold requirement, the Court must determine that the length of delay is presumptively prejudicial. *Id.* "[T]he length of the delay is the triggering factor because 'until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'" *Wilson*, 250 F.3d at 394 (quoting *Barker*, 407 U.S. at 530); *see also Doggett*, 505 U.S. at 651-52. If the length of the delay is found to be "presumptively prejudicial," it must then be considered "as one factor among several" in determining whether the accused was deprived of his Sixth Amendment speedy trial right. *See Doggett*, 505 U.S. at 652 (citing *Barker*, 407 U.S. at 533-34). Although delays approaching one year are "presumptively prejudicial" and thus satisfy the threshold requirement for review of a speedy trial claim under the four-factor balancing test, *see, e.g., Doggett*, 505 U.S. at 652 n.1, "only those periods of delay attributable to the government or the court are relevant to [Petitioner's] constitutional claim." *United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000) (citing, *inter alia*, *Barker*, 407 U.S. at 529 ("We hardly need add that if delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine.")).

As observed by the Ohio Court of Appeals, Petitioner's trial attorney filed a motion for continuance, along with a speedy trial waiver signed by Petitioner, on November 29, 2017. (Doc. 17, Exs. 7 & 8). At this time, only 70 days had elapsed since Petitioner's September 20, 2017 arrest and indictment (*see* Doc. 17, Ex. 42, at PageID 547), far less than the one-year delay required to trigger a presumption of prejudice and analysis of the remaining speedy-trial factors. And, even if the Court were to credit Petitioner's argument that, despite its broad language, the speedy trial

waiver he signed was not unlimited (*see* Doc. 1, at PageID 8; *see also* Doc. 17, Ex. 8 (containing

a copy of the Waiver of Right to Speedy Trial)),[3] the trial commenced on December 4, 2018, less

than six months after the new June 12, 2018 date then set by the court (*see* Doc. 17, Ex. 9; Doc.

17-2, at PageID 576).  Either way, the relevant period of delay for Petitioner's speedy trial claim

is less than sixth months.  Because the length of the delay was not "uncommonly long," Petitioner

is unable to demonstrate that Sixth Amendment speedy trial concerns are implicated in this case.

*See Schreane*, 331 F.3d at 553 (noting that "if the delay is not uncommonly long, judicial

examination ceases").  *See also Herron v. Kelly*, No. 1:10-cv-1783, 2013 WL 3245326, at *6 (N.D.

Ohio June 26, 2013) (finding six-month delay was not "presumptively prejudicial").

Moreover, even if Petitioner could satisfy the threshold showing that the delay in his case

was "presumptively prejudicial,"[4] upon consideration of the remaining speedy-trial factors, the

undersigned is convinced that Petitioner is not entitled to habeas corpus relief on his claim that he

was deprived of his constitutional right to a speedy trial.

The second factor, the reason for the delay, involves determining whether the government

or Petitioner was "more to blame."  *Doggett*, 505 U.S. at 651.  This factor weighs against

---

[3]Petitioner's Waiver of Right to Speedy Trial (Doc. 17, Ex. 8, at PageID 390) provided:

> I, the above named defendant, being represented by counsel and having been advised of my rights, statutory and constitutional, to a speedy trial under the Sixth Amendment of the Constitution of the United States and Article I, Section 10 of the Ohio Construction, and pursuant to Ohio Revised Code Section 2945.71, 2945.72, 2945.73 and Superintendence Rule 8(B) hereby irrevocably waive my right to a speedy trial.

[4]Both Petitioner and Respondent appear to assume that the pretrial delay in this case was "presumptively prejudicial," triggering a review of the remaining speedy-trial factors.  (*See* Doc. 1, at PageID 8; Doc. 18, at PageID 1585).  However, in so doing, both parties include the entirety of the approximately fourteen-month delay between the time of Petitioner's arrest and indictment on September 20, 2017, and the commencement of his trial on December 4, 2018, in their calculation.  (*See* Doc. 17, Ex. 1; Doc. 17-2, at PageID 576).  But this is incorrect because two of the three trial continuances in the underlying case were at defense counsel's request.  *See Howard*, 218 F.3d at 564; *Barker*, 407 U.S. at 529.  Moreover, as set forth herein, even if Petitioner could satisfy the threshold showing that the delay in his case was "presumptively prejudicial," he has not shown that he was deprived of his constitutional right to a speedy trial.

Petitioner, considering that, in addition to the above-mentioned motion for continuance, his attorney expressly asked for and was granted a second continuance after undergoing an unexpected medical procedure.  (Doc. 17, Ex. 11, at PageID 393-94).  The only other delay occurred when the trial court continued the trial date for 70 days on its own motion.  (Doc. 17, Ex. 10, at PageID 392).  Nothing in the record suggests that any delay not attributable to Petitioner was excessive, intentional, or motivated by bad faith.  *See Barker*, 407 U.S. at 531; *Doggett*, 505 U.S. at 656–57; *Schreane*, 331 F.3d at 553–54.

The third factor concerns whether Petitioner asserted his right to a speedy trial in a timely and proper manner.  There is no indication that Petitioner asserted his right to a speedy trial in the trial court.  To the extent Petitioner asserts that he asked his attorney to do so (*see* Doc. 21, at PageID 1630), defense counsel's two requests for continuances (Doc. 17, Exs. 7, 11) indicate that counsel likely believed that the seriousness of the charges and number of witnesses required the additional time.  This factor thus does not weigh in the Petitioner's favor.

Finally, the fourth factor, prejudice, concerns three interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."  *Barker*, 407 U.S. at 532.  "Of these, the most serious is the last, because the inability of a defendant to adequately prepare his case skews the fairness of the entire system."  *Id.*  Although Petitioner asserts all three types of prejudice (*see* Doc. 1, at PageID 8; Doc. 21, at PageID 1630), he has not demonstrated specific or substantial prejudice in preparing his defense, as prescribed by *Barker*.  *See also Schreane*, 331 F.3d at 559 (quoting *Howard*, 215 F.3d at 564) ("If 'the government prosecutes a case with reasonable diligence, a defendant who cannot demonstrate how his defense was prejudiced with specificity will not make out a speedy trial claim no matter how great the ensuing delay.'").

24

Accordingly, the undersigned concludes that Petitioner was not denied his Sixth Amendment right to a speedy trial.  Therefore, neither trial nor appellate counsel was ineffective in failing to raise this issue.  Ground Three should be denied.

## IV.    CONCLUSION

Accordingly, the undersigned concludes that Petitioner's federal habeas corpus Petition fails on the merits.  Therefore, the Petition (Docs. 1; 21) should be **DENIED**.  Because the undersigned concludes that denial of the Petition is appropriate on the merits, the undersigned further recommends that Respondent's motion to dismiss (Doc. 8) be **DENIED AS MOOT.**

### IT IS THEREFORE RECOMMENDED THAT:

1.    The Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Docs. 1; 21) be **DENIED**.

2.    Respondent's motion to dismiss (Doc. 8) be **DENIED AS MOOT.**

3.    To the extent that Petitioner has raised claims that have been considered on the merits herein, a certificate of appealability should not issue because Petitioner has not stated a "viable claim of the denial of a constitutional right," nor are the issues presented "adequate to deserve encouragement to proceed further."  *Slack*, 529 U.S. at 475 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983), *superseded on other grounds by* 28 U.S.C. § 2253(c)(2)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

4.    With respect to any application by Petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** Petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

**PROCEDURE ON OBJECTIONS:**

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g., Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to the magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted).


February 4, 2026

*Chelsey M. Vascura*
CHELSEY M. VASCURA
United States Magistrate Judge